Statement of the Case.
MONROE, J.
Plaintiff prays to be decreed the owner (subject to a servitude, in favor of defendant, of a right of way, not to exceed 15 feet in width) of a certain portion of the square of ground, No. 150, in this, city, bounded by Hagan avenue, Violet (or Clark), Melpomene, and Thalia streets, all,, as described in her petition (and supplemental petition) and as approximately represented on the subjoined sketch, the portion in question being represented by the letters *547 B, B, B, and bounded by Hagan avenue, Melpomene, and Clark streets and tbe “fence,” tbe latter, perhaps (differently from the dotted line, as on the sketch) having one of its termini on the Thalia street, rather than on the Hagan avenue, line, thus extending the boundary of the property around the corner of the avenue and for some little distance on the street.
[[Image here]]
Plaintiff and defendant (and the warrantors who have been called in) claim under a common author, Henry Parish, who, some time prior to 1842, had apparently retired from the firm of Gasquet, Parish & Go., of this city, leaving his partners to liquidate the business; and, probably, as part of the liquidation, they, in 1848, brought suit against Madame Curell for the partition of a tract of land which she and the members of tbe firm held in indivisión, and which included, or was supposed to include, the square, No. 150, here in question, and there was a judicial partition, the result of which was that, on November 4, 1848, Henry Parish was decreed to be the owner of square No. 150 and certain other squares. In the meanwhile, in 1842, Parish had made a will, whereby he disposed of his real estate in Louisiana as follows:
“Sixth: I give, devise and bequeath unto my friend, Peter Conrey, of New Orleans, my part, or share, or interest in the undivided real estate situated in Louisiana belonging to my late firm of Gasquet, Parish & Co., in trust, to convey the same, or pay over the proceeds thereof, to my namesake, Henry Parish Conrey, son of the said Peter Conrey; a part of which undivided real estate is situated in Jefferson parish in the said state of Louisiana, and the balance (about 3,500 acres of land) " * * in said state; it being my wish that the liquidating partners of my said late firm should be allowed, if they should think best, to sell said undivided real estate and pay the proceeds over to the said Peter Conrey; and, in case the said real estate should be divided, it is my wish that the portion allotted, or set apart, to me shall be conveyed to my said namesake; my desire being, not, by this devise, or bequest, to embarrass my late partners in the liquidation or settlement of the estate of my said late firm.”
Thereafter the testator died in New York, where he had liyed, and, on December 17, 1857, his will was there admitted to probate. Some time prior to December, 1859, Henry Parish Conrey died; his succession was opened in. the Second district court of this parish; an inventory was taken, in which the property here in question was included, as belonging to said succession; and, on June 9, I860, James Grimshaw, as administrator, executed a notarial act of sale, conveying said property, with, other squares, to George Brewer, pursuant, as the act recited, to an adjudication previously made by order or court at public auction; said act containing the further recital:
“Which portions of ground belong to the said late Henry Parish Conrey, for having inherited the same from Henry Parish, agreeably to his testament, dated the twentieth of September, 1842, duly probated in the surrogate’s court, of the state and county of New York,” etc.
George Brewer was adjudged a bankrupt on December 28, 1875; and, on January 15, 1876, all of his estate, real and personal, was conveyed by the register to Charles H. Reed, assignee, who, on November 23, 1876, *549 in confirmation of a sale which had previously been made, by order of court, at public auction, executed a notarial act, conveying said property to the plaintiff herein, who was the wife of the bankrupt, separate in property by marriage contract.
In the meanwhile (that is to say, on April 11, 1868) Daniel Parish, appearing as a resident of the state of New York, presented a petition to the Second district court, alleging that the will of Henry Parish had been admitted to probate in that state; that he had there qualified as one of the executors, presenting an exemplified copy of the will and of the proceedings for probate of the same, and praying that said will be registered and executed; and an order to that effect was made. Thereafter, on March 21, 1871, at the instance of the same petitioner, an inventory was made, which included the square, No. 150, here in dispute, as belonging to the succession of Henry Parish; and later still the petitioner apiffied for an order for the sale of the property so inventoried, alleging in his petition :
“Tii at the estate is without debts; that he is desirous of closing out the affairs of the said succession and of disposing of the property thereof.”
And the order was made, and was followed by a sale of the property, on April 25, 1S71 (as we infer, from the recital In another instrument, though the act of sale is not in the record), to H. C. Boucher, after which, to wit, on May 20, 1871, Daniel Parish presented a petition to said Second district court, asking that he be recognized as executor of Henry Parish, and that letters issue to him as such, and an order to that effect was then made.
H. C. Boucher, on January 15, 1872, sold the property to George W. Babcock; and the widow and heirs of Babcock, oh September 8, 1896, sold It to Benjamin Recurt, who, on March 31, 1S97, sold it to William Laferriere, Etienne Gelé, and Jean Marie Gelé, who, on November 22, 1898, sold to the present defendant a portion of said square No. 150, described as follows (the description being taken from the record in the conveyance office):
“Commencing, corner of Hagan avenue and Melpomene street, portion measures 233' 9" front on Hagan avenue, up to the comer of Thalia street; thence, a depth, alongside of Thalia street, of 35', running towards Clark street; thence, on a line having a curve of 4 degrees and running towards Clark street, and reaching to Clark street at a point on said Clark street 83' 6" distant from the corner of Clark and Melpomene streets; thence, along-said Clark street a distance of 83' 6“ up to the corner of Melpomene street, and, thence, a depth and front on Melpomene street of 227' 7", up to the point of beginning, at the corner of Melpomene Street and Plagan avenue.”
The defendant railroad company, had laid its track, as represented on the sketch, in 1882 or 1884, without any pretense of a title to the land, or any part of it, and some years later it had put up the fence, probably as a measure of precaution. Briggs, an old negro, lived as a squatter in what the witnesses call “an old shack,” somewhere iu the neighborhood of the spot where the name appears, prior to the sale to Recurt, and does not appear to have attorned to any one. 1-Ie is said to have been put off by Laferriere and the Gelés. Douglas, another negro, testifies that he built his house (which is also called a “shack”) in October, 1896, and that he rented from Gelé; but Laferriere and the Gelés did not make their purchase until March 31, 1897, and do not pretend to have had anything to do with the property prior to that time, and the nearest that Douglas could, or did, come to fixing a date at which he began to pay rent was by the production of certain rent receipts, which are referred to in his cross-examination as being dated January 1, May 1, July 1, and October 1, 1909. Pie said that he had others, and could and would produce them, but he did not produce them, and no witness for defendant or the warrantors *551 was called to show that he had ever made any payment prior to that evidenced by the earliest of the receipts above mentioned; nor did any witness, in any other way, fix the date at which he began to attorn for his holding.
The railroad company, by way of defense, sets up the title acquired by it from Laferriere and the Gelés, on November 22, 1898; alleges that it had laid its track in 18S2, and had been in possession from that date; that it, and its vendors, has been in possession openly, peacefully, without disturbance, and under title translative of property, for more than 10 years. It also pleads the prescription of two years, under Act No. 227 of 3902. It further alleges that it has established a servitude for its roadbed, occupying a strip of land 50 feet wide, and that, even if plaintiff should be decreed to be the owner of the land, it cannot be evicted, but that she (plaintiff) should be relegated to a suit for the value of the land. And it concludes by calling its vendors in warranty.
William Laferriere and Etienne Gelé, and the widow and heirs of Jean Marie Gelé, set up a title, acquired, as they allege, in good faith, and possession thereunder since March 31, 1897; and they set up title and possession in good faith in their authors, and plead the prescription of 5, 10, and 30 years. They deny that plaintiff, or his authors, including Henry Parish Conrey, ever had any title, and allege that the bequest in the will of Henry Parish, under which they claim, was a prohibited substitution. And they call their vendor, Recurt, in warranty.
The answer of Recurt is much the same, and he calls his vendors in warranty; and they,, after pleading prescription and some other matters by way of exception, interpose a general denial. In this court Laferriere and the Gelés have filed a plea of 'prescription of two years, under the bankrupt law of 1867 (Act March 2, 1867, c. 176, 14 Stat. 517), now incorporated in the Revised Statutes of the United States as section 5057. There was judgment in the district court in favor of plaintiff for the land claimed, “subject to a servitude, in favor of defendant railroad company, of passage and for railroad purposes generally, extending 25 feet on each side of the center of defendant’s track, now traversing said square,” and for costs, the claim for damages being dismissed, as in case of nonsuit; and there was judgment in favor of defendant and against itswarrantors, and in favor of those called in against those whom they called, for costs, all other claims being dismissed as in case of nonsuit; and all those so cast have appealed.
Opinion.
[1] The objection that plaintiff’s title is based upon a prohibited substitution is not well founded. The intention of the testator, and the effect of the bequest, was to vest the-ownership of the property bequeathed in the-legatee, and the condition that the property should be held in trust by another person was an impossible one, which is (to quote the language of the law) “reputed not written.” Giv. Code art. 1519; Succession of Beauregard, 49 La. Ann. 1176, 22 South. 348.
[2] The legacy under particular title gave the particular legatee a right to the thing bequeathed from the day of the testator's-death, which right was transmitted to his heirs and assigns. •Civ. Code art. 1626. Now it is true, as suggested by the learned counsel for the warrantors, that the law declares that no will can have effect, unless it has been presented to the judge of the parish in which the succession is opened; that testaments made in other states cannot be carried into effect on property in this state, without being registered in, and ordered to be executed by, the court within the jurisdiction of which the property affected is- *553 situated; that the delivery of legacies under particular title must be demanded of the testamentary executor; that the legatee, who, of his own authority, takes possession ■of his legacy, is bound to restore the fruits and pay interest upon moneys of which he may have possessed himself; and that the rule, to the effect that the legal heir, or the instituted heir, is called to the inheritance immediately after the death of the deceased, does not apply to the particular legatee; but those provisions are intended to guard against the carrying into effect of testamentary dispositions which may be at variance with the law or public policy of the state, and against the payment of particular legacies, to the prejudice of forced heirs and creditors, and they do not operate to destroy the effect of a particular legacy, otherwise valid, or to deprive the particular legatee of the right to the thing bequeathed to him, from the day of the testator’s death, or to furnish authority to an executor, whose testator has left no debts, or to one who has not been recognized as executor, to procure the sale, by order of court, of a thing which the will directs shall be delivered to such legatee, and which, in fact, has already been sold, by order of the same court, as belonging to the succession of the legatee.
[3] The will of Henry Parish was presented to the probate court, within the jurisdiction of which the property in question was situated, by Daniel Parish, and its execution was ordered; which is to say that the executors named in the will (and Daniel Parish was one of them, though he did not, until afterwards, obtain recognition as such from that court) were ordered to deliver to Henry Parish Conrey, or his heirs or assigns (he having been alive when the testator died), the property here in controversy. It is true that said property had already been inventoried and sold, by order of the same court, in the succession of the legatee; and forced heirs, or creditors, of Henry Parish, if any there were, thereafter presenting themselves, might have invoked the articles of the Civil Code upon which the learned counsel for the warrantors is now relying; but neither defendant nor the warrantors, claiming under the sale made at the instance of Daniel Parish can do so successfully (1) because, even though delivery had not been demanded, the ownership of the property was vested in the legatee, his heirs or assigns, and its sale, as the property of the succession of Henry Parish, was the sale of the property of another; (2) because, when Daniel Parish applied for the order of sale, and when the sale was made, he had not been recognized in this state as executor; (3) because, having qualified in New York, as executor, though without authority to act here, it was his duty to carry into effect the expressed wish and purpose of the testator, and he had no capacity to defeat such wish and purpose; (4) because (as he alleged in his petition for the order of sale) the succession owed no debts. Civ. Code, arts. 1626, 2452; Townsend v. Sykes, 38 La. Ann. 859; Burton v. Brugier, 30 La. Ann. 479; Burns v. Van Loan, 29 La. Ann. 560; Succession of Dumestre, 40 La. Ann. 571, 4 South. 328; Succession of Dupuy, 4 La. Ann. 570; Sicard v. Schwab, 112 La. 475, 36 South. 500.
[4] In their brief counsel for defendant say:
“In 3882 the Yazoo & Mississippi Yalley Railroad Company, without title to any part of this land, laid its tracks across square 150, and has continued, until the present time, to use those tracks; but in 1898 it decided to acquire a title to the part of the land used by it, and, on November 22, 1898, purchased from the Gelds and Laferriere the .part of the square for which Mrs. Brewer now sues.”
There can be no doubt, therefore, that from 1882 until November 22, 1898, defendant’s possession of so much of the land as was covered by its roadbed, and, during part of the time, of so much as was included be *555 tween the Melpomene side of its roadbed and tiie stock fence which it built on the Thalia street side, was that of a mere trespasser, and, whilst such possession may, and no doubt, does, affect the question of its right to the servitude which it enjoyed, it does not of itself establish title to the land, or any part of it, nor aid defendant’s authors in establishing title.
Laferriere and the Gelés acquired from Bernard (alias Ben) Recurt (or “Recourt,” as counsel for warrantors gives the name) March 31, 1897, by the following description:
“5tl>. A certain square of ground, situated in the sixth district of this city, designated as square No. 150, bounded by Clark, Thalia, and Melpomene streets and Hagan avenue.”
And Recurt had acquired, on September 8, 1896, from the widow and heirs of Babcock, who had acquired, on January 15, 1872, from Boucher all, practically, by the same description. It is not pretended that any of the authors of Laferriere and the Gelés were ever in actual possession of any part of the square, and, as they (Laferriere and the Gelés) held the (paper) title only from March 31, 1897, to November 22, 1898, it follows that, in order to establish title by prescription to the portion here claimed, resulting from 10 years, actual, open, peaceful, and uninterrupted possession as owners, in good faith, under a title translative of property, they are bound to prove such possession, beginning at a date prior to Novem.ber 18, 1898, since defendant, as we understand, was served with citation in this suit within 10 years from that time. [5] Their claim is that they had possession, through Douglas, who occupied part of the land, and that possession of a part, with title to the whole, carried with it possession of the whole. But the rule which they invoke cannot be applied to the facts of the case, because they do not show that Douglas recognized and attorned to them 10 years before this suit was brought, and a “possessor who cannot fix exactly the origin of his possession cannot prescribe.” Civ. Code, art. 3486; Laidlaw v. Landry, 12 La. Ann. 151; Gasquet v. Directors, etc., 45 La. Ann. 344, 12 South. 506. Moreover both Briggs and Douglas went upon the land as squatters and trespassers, and possessed only what they squatted on. Briggs was driven off, and Douglas is shown to have paid rent from January 1, 1909, for his holding; but the extent of his holding was not enlarged, either actually or constructively, whether for his own benefit or for the benefit of those who had acquired the title after he had thus, as a trespasser, possessed himself of it. Chapman v. Morris, etc., Ass’n, 108 La. 283, 32 South. 371.
It is said that this action is barred by the prescription of 30 years, because neither Henry Parish Conrey nor those who derived title through him demanded delivery of the property, within that time, from the executors of Henry Parish. But the administrator of Conrey took possession of the property within, say, three years after the death of Henry Parish and caused it to be sold, under order of court, as belonging to Conrey’ssuccession, and Brewer, the purchaser, acquired the constructive possession, following his title, and retained it, so far as this record shows, without interference of any kind until defendant laid its track, in 18S2, all of which we think, served as an effectual interruption of the prescription invoked, notwithstanding that the will of Henry Parish, though exhibited as a muniment of title to-the notary before whom the act of sale to-Brewer was executed, had not been probated in this state, and notwithstanding that no demand is shown to have been made on the executors.
[6] On the other hand, the prescription of 30 years, acquirendi causa, must be founded on continuous, uninterrupted, public, unequivocal, possession, under title, or claim of title, though the possessor need not be in *557 good, faith (Civ. Code, arts. 3500, 3503), and defendant and warrantors have shown no such possession.
[7] The prescription of fire years, against informalities, “connected with, or growing out of,” public sales, is also pleaded by way of defense; but that prescription is inapplicable to radical nullities, such as those which affected the sale made at the instance of Daniel Parish.
[8] Counsel for the warrantors further plead a prescription established by the Revised Statutes of the United States, to wit:
“Section 5057. No suit, either at law or in equity, shall be maintained in any court, between the assignee in bankruptcy and a person claiming an adverse interest, touching' any property, or right of property, transferable to, or vested in, such assignee, unless brought within two years from the time when such cause of action accrued for, or against, such assignee. And this provision shall not, in any case, revive a right of action barred at the time when an assignee is appointed.”
The provision of law thus invoked applies, in terms, to causes of action which have accrued “for, or against such assignee,” but not to causes of action which arise between persons who purchase property from an assignee and other persons, long after such purchases, and long after, the assignee has become functus officio; and it does not apply to this case, because, in January, 1876, when Reed was appointed assignee in bankruptcy of Brewer, the cause of action here sued on did not exist, since neither the defendant nor any of its authors pretended at that time to be in possession of the land here claimed, or had ever done anything to interfere with the constructive possession following the authentic act by which Brewer acquired his title. The distinction between cases where a right of action has accrued for, or against, an assignee (to which the statute applies) and those where the right of action has not accrued (to which the statute does not apply) is made in Bowens v. Delaware, etc., R. Co., 153 N. Y. 476, 47 N. E. 907, 60 Am. St. Rep. 667, and in Dushane v. Beall, 161 U. S. 513, 16 Sup. Ct. 637, 40 L. Ed. 791.
[9] Plaintiff makes no complaint of the judgment appealed from, in so far as it recognizes a right of servitude in defendant; but the warrantors, among their other objections, say that the judgment is erroneous, in that it dismisses plaintiff’s claim for 'damages as in case of nonsuit, instead of rejecting it as barred by the prescription of 10 years; and the objection appears to us to be good. McCutchen v. Texas & P. Ry. Co., 118 La. 439, 43 South. 42.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended, in so far as to reject, finally, the claim set up by plaintiff for damages, as also the like claims set up by the other litigants, against their respective warrantors. It is further decreed that, as thus amended, said judgment be affirmed; the costs of the appeal to be paid by the plaintiff.